IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH MARINO | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | NO. 03-3058 |
| | : | |
| v. | : | |
| | : | |
| SLS, INC. d/b/a HOLT OVERSIGHT AND | : | |
| LOGISTICAL TECHNOLOGIES, ET AL. | : | |
| | : | |
| Defendants | : | |

**DEFENDANTS, SLS, INC. d/b/a HOLT OVERSIGHT AND LOGISTICAL
TECHNOLOGIES, INC. AND TRANS OCEAN MARITIME SERVICES, INC.'S,
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendants, SLS, Inc. d/b/a Holt Oversight and Logistical Technologies, Inc., and Trans Ocean Maritime Services, Inc., and for their Motion for Summary Judgment brought pursuant to Fed. R. Civ. P. 56(b), states as follows:

1. This action stems out of an alleged injury to Plaintiff, a longshoremen employed as a stevedore with Co-defendant Trans Ocean Maritime Services, Inc. (hereinafter "Trans Ocean"), which occurred on June 23, 2000, while he was in the hold of a vessel assisting in the discharge of steel cargo.

2. The vessel was owned and operated by Kent Line International d/b/a Voyageur Shipping Ltd. (herinafter "Kent Line"). Inchcape Shipping (hereinafter "Inchcape") acted as the vessel's agent while at port in Philadelphia.

3. Plaintiff's first Complaint was filed on June 6, 2002, against Kent Line, Inchcape, and SLS Inc. d/b/a/ Holt Oversight and Logistical Technologies (hereinafter "Holt") in the Philadelphia Court of Common Pleas, and was removed to this Court on July 8, 2002 (02-CV-

4488).  The theory against Holt was that it owned, operated, maintained and managed the stevedoring terminal where plaintiff was injured at Gloucester City, New Jersey.

    4.       On February 26, 2003, after substantial discovery, all claims against Holt were dismissed, without prejudice, by the Court on stipulation of the parties, since discovery confirmed that Holt did not own, operate, maintain and manage the shipping terminals at Gloucester City, New Jersey, as alleged.

    5.       On April 9, 2003, the deposition of Joseph Levy, an employee of Holt who at the time of the incident was providing consultive management services for Trans Ocean Maritime Services Inc., was conducted.

    6.       The deposition of Maureen Levy, the daughter of Joseph who was also employed with Holt as an Environmental Compliance Administrator, was not taken.

    7.       Despite Mr. Levy's testimony confirming that Holt and he were acting on a consultive-agent basis for Trans Ocean and had no role in the activities at issue, and that his daughter was never assigned to Trans Ocean, Plaintiff filed the instant Complaint against moving defendants:  Holt and his employer, Trans Ocean, and Joseph Levy and his daughter, Maureen Levy (03-CV-3058).

    8.       Moving defendants were served with the complaint.  Joseph and Maureen Levy were not.

    9.       On July 10, 2003, this case was consolidated with the first action filed by Plaintiff.

    10.      Discovery in these consolidated cases ended on July 14, 2003.

    11.      Plaintiff alleges that he was a longshoreman employed with Trans Ocean and that on June 23, 2000, while discharging cargo from the KENT VOYAGEUR, a vessel owned and

operated by Kent Line, he was injured because of the dangerous condition of the cargo. Ex. "A," Complaint, ¶1, 14.[1]

12. Plaintiff alleges that Holt "assumed responsibility to oversee the safe logistical transport of goods by the longshoremen" at Defendant Trans Ocean in that it "supplied safety consultants," Co-Defendants Joseph Levy and his daughter Maureen Levy, to Trans Ocean; and that Holt and these individuals breached their duty of insuring safe logistical transfer of the goods during the relevant time. Ex. "A," ¶ 5, 1217; 19-22; 24-27.

13. Plaintiff also alleges gross negligence against his employer, Trans Ocean, claiming that it was "substantially certain that its delegation of the safe logistical transfer to Defendant Holt and its related failure to hire, supply and train able reasonable provident consultants capable of establishing, assuring, achieving and/or maintaining the safe logistical transfer of goods would cause injury to plaintiff." *Id.*, ¶29.

14. Plaintiff further claims that Trans Ocean's actions were "plainly beyond anything the legislature intended the workers' compensation act to immunize" and "constitute wanton and willful misconduct" entitling him to punitive damages. Ex. "A," ¶31-32).

15. The KENT VOYAGEUR had a cargo of steel plates, steel bars, hollow sections, steel beams, cased machinery, tubes and angles. Ex. "B," Crouse dep., Ex. 4.

16. The vessel arrived in Gloucester, N.J. on June 22, 2000 and commenced discharging at 6:30 p.m. that evening.

17. Trans Ocean, Plaintiff's employer, was retained by Kent line to act as stevedore

---

[1] All exhibits referenced herein are attached to Defendants' Memorandum of Law in Support of Motion for Summary Judgment filed concurrently herewith.

and to provide longshore labor to discharge the vessel. Ex. "C," Paul Levy Dep., p. 43.

18. Plaintiff begin working on the vessel on June 23, in No. 3 hold, at approximately 7:00 a.m. Ex. "D," Plaintiff's dep., p. 19. The accident occurred at approximately 8:30 a.m. *Id.*, p. 20.

19. The brunt of Plaintiff's allegation of negligence against all the parties rests on his assertion that while he was in the hold performing his discharge duties, the ship suddenly listed causing the cargo to shift and trap his leg and foot. *Id.*, p. 20.

20. The persons responsible for the discharge operations were James McLaughlin, the Stevedoring Superintendent, Scott Palmer, the Ship boss, and George Ulmer the Crew Chief, all employed by Trans Ocean. A Cargo Surveyor, Captain William Sammons, was also hired by Trans Ocean to inspect the cargo before discharge.

21. Mr. McLaughlin, Trans Ocean's Superintendent, testified that it was his duty to inspect the cargo to determine whether it could be safely discharged, and that he did not note anything unusual. *Id.*, pp. 14-15.

22. Mr. McLaughlin reviewed photographs of the cargo in the hold and confirmed that there was nothing that would indicate that the cargo could not be discharged safely. *Id.*, 102-104. Although broken steel cargo bands were observed and can create some difficulties in discharge, this is a frequent occurrence which does not normally prevent a safe cargo discharge. *Id.*

23. Superintendent McLaughlin testified that when conducting his assessment of whether a safe discharge may be made, he relies on the Crew Chief who was is down in the hold itself. *Id.*, 101-102.

24. Trans Ocean's Crew Chief was George Ulmer, who confirmed that it was his

responsibility to continually assess the condition of the cargo to determine whether it was safe to discharge. Ulmer dep., Ex. "F," pp. 14-16.

25.     Trans Ocean also retained National Cargo Bureau to provide one of its senior surveyors, Captain William Sammons, to inspect the cargo before discharge operations. Ex. "G," Sammons dep., pp. 6.

26.     Captain Sammons testified that he climbed into the No. 3 hold and conducted a thorough pre-discharge inspection of the cargo hold on behalf of Trans Ocean. *Id.*, pp. 31-33, 63.

27.     Captain Sammons observed that there were bundles of steel with broken bands, and that a number of bundles had "tripped" or shifted. *Id.*, pp. 41-50. However, like Superintendent McLaughlin, he concluded that there was nothing in the condition of the stow that would have prevented the stevedore from safely discharging the cargo. *Id.,* pp. 63-68.

28.     Had Captain Sammons believed any problem in discharging existed, he would have notified Superintendent McLaughlin. *Id.*, pp.74-77.

29.     Holt, which is no longer in business, at relevant times was a management consulting agency which performed various services to principals. Ex. "H," Holt Affidavit. These services included contract administration, bookkeeping, billing and invoicing, insurance administration, risk management, and inventory management and control. *Id.*

30.     At all times, Holt acted as an agent for its principals, including Trans Ocean Maritime Services, Inc. *Id.*

31.     Joseph Levy, an employee of Holt, was assigned by Holt to Trans Ocean to provide services in the capacity of General Manager, and worked in this capacity from late 1996

until May 1, 2002. Ex. "C," dep. transcript Jos. Levy, pp. 19, 21-22.

32. Although initially brought in to address inventory issues, Mr. Levy's duties at Trans Ocean consisted of oversight and management, including contract administration, bookkeeping, billing and invoicing, and inventory management and control. *Id.*, pp. 18-20; Ex. "A". During this period, he occasionally consulted with other principals. *Id.*, p. 18.

33. At his deposition, Mr. Levy was questioned by Plaintiff's counsel of his daughter, Maureen Levy, who was also an employee of Holt during relevant times. Ms. Levy was an Environmental Compliance Administrator with Holt and at no time was assigned to provide any sort of management consultant services to Trans Ocean, nor was she stationed there. Ex. "H"; Ex. "C," pp. 65-68.

34. Maureen Levy's primary duties with Holt were in the environmental, and not in the occupational safety realm. Ex. "H"; Ex. "C," p. 129-130.

35. Regarding the incident, Mr. Levy testified that he does not recall boarding the vessel, and did not normally go aboard vessels being discharged unless there were extenuating circumstances such as a productivity problem. Ex. "C," pp.81-82.

36. Mr. Levy did not participate in the unloading activities at issue in this litigation. He did not give any directions concerning the unloading, and did not view the cargo in the hold prior to discharge. Ex. "H". This was not in the realm of his job duties, but the responsibility of the Stevedoring Superintendent, the Ship Boss, and the Crew Chief. Ex. "C," pp. 83-92.

37. There is no genuine issue of material fact that all claims against Trans Ocean must be dismissed pursuant to the exclusive liability provision of the Longshoreman's and Harbor Worker's Compensation Act ("L.H.W.C.A."), 33 U.S.C. §905 (a), since it was Plaintiff's

employer at all relevant times and there is no basis to assert that it acted with a specific intent to injure Plaintiff.

38.     There is no genuine issue of material fact that all claims against Holt must be dismissed since there is no evidence that Holt committed any independent acts of negligence which caused Plaintiff's alleged damages.  The only relationship Holt has to this litigation consists of its assignment of Joseph Levy to Trans Ocean to perform General Manager duties.

39.     Mr. Levy's duties did not require him to be actively involved in the discharge activities.  He did not board the M/V KENT VOYAGEUR or participate in the unloading activities at issue in this litigation.  He did not give directions concerning the unloading, nor view the cargo in the hold prior to discharge.  These responsibilities rested with the Stevedoring Superintendent, the Ship Boss, and the Crew Chief, as testified to by Messrs. McLaughlin, Sammons, Ulmer, and Levy.

40.     The testimony of those in charge of the operation at Trans Ocean is that thorough inspections were made and that they concluded that the holds were safe for discharge.

41.     The thrust of Plaintiff's allegation of negligence is that the ship listed causing the cargo to shift.  It cannot be reasonably claimed, nor is there any evidence on the record to suggest that the stevedoring supervisors, let alone the Mr. Levy or Holt, caused the vessel to list.

42.     Even assuming, *arguendo*, that Mr. Levy committed any independent fault for which Holt could be assessed, under applicable case law there is no genuine issue of material fact that Mr. Levy was a borrowed servant of Trans Ocean and thus shares the latter's immunity to suit provided by §905 (a) of the L.H.W.C.A.  As such, the claims against Holt must be dismissed on this additional basis.

43. Moving Defendant's further move this Court to impose sanctions on Plaintiff for violating his obligations under Fed. R. Civ. P. 11, since there are no facts on the record to support the allegations against Trans Ocean and Holt and its employees, Joseph Levy and his daughter.

44. Naming Mr. Levy's daughter, Maureen, as a party purportedly linking Holt to negligence, is especially indicative of the frivolous, and indeed *mala fides*, manner in which this Complaint was filed.

45. Plaintiff conducted little or no review of the applicable law regarding employer immunity under the L.H.W.C.A. prior to filing his claims against his employer, Trans Ocean. Had he done even a cursory review, it would have been quite clear that asserting "gross negligence" or "punitive damages" does not provide a basis for side-stepping the employer immunity provided in the L.H.W.C.A.

WHEREFORE, SLS Inc. d/b/a/ Holt Oversight and Logistical Technologies and Trans Ocean Maritime Services, Inc. pray this honorable Court grant their motion for summary judgment, together with an award of costs, attorney fees, and such other sanctions as this Court deems appropriate under Fed. R. Civ. P. 11.

                                                Respectfully submitted,
                                                MATTIONI, LTD.

Dated: August 19, 2002           BY: _____
                                                FAUSTINO MATTIONI, ESQUIRE
                                                PAUL A. KETTUNEN, ESQUIRE
                                                399 Market Street, Second Floor
                                                Philadelphia, PA 19106
                                                (215)629-1600