IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH MARINO | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | NO.   02-4488. |
| | : | |
| v. | : | |
| | : | |
| SLS, INC. d/b/a HOLT OVERSIGHT AND | : | |
| LOGISTICAL TECHNOLOGIES, ET AL. | : | |
| | : | |
| Defendants | : | |

**DEFENDANTS, SLS, INC. d/b/a HOLT OVERSIGHT AND LOGISTICAL TECHNOLOGIES, INC. AND TRANS OCEAN MARITIME SERVICES, INC.'S, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION AND PROCEDURAL HISTORY**

This action stems out of an alleged injury to Plaintiff, a longshoremen employed as a stevedore with Co-defendant Trans Ocean Maritime Services, Inc. (hereinafter "Trans Ocean"), which occurred on June 23, 2000, while he was in the hold of a vessel assisting in the discharge of steel cargo. The vessel was owned and operated by Kent Line International d/b/a Voyageur Shipping Ltd. (herinafter "Kent Line"). Inchcape Shipping (hereinafter "Inchcape") acted as the vessel's agent while at port in Philadelphia.

Plaintiff's first Complaint was filed on June 6, 2002, in the Philadelphia Court of Common Pleas, and was removed to this Court on July 8, 2002 (02-CV-4488). The first Complaint was filed against Kent Line, Inchcape, and SLS Inc. d/b/a/ Holt Oversight and Logistical Technologies (hereinafter "Holt"). The theory against Holt was that it owned, operated, maintained and managed the stevedoring terminal where plaintiff was injured at Gloucester City, New Jersey.

On February 26, 2003, after substantial discovery, all claims against Holt were dismissed,

without prejudice, by the Court on stipulation of the parties, since discovery confirmed that Holt did not own, operate, maintain and manage the shipping terminals at Gloucester City, New Jersey, as alleged.

On April 9, 2003, the deposition of Joseph Levy, an employee of Holt who at the time of the incident was providing management consultant services for Trans Ocean Maritime Services Inc., was conducted. Despite testimony clearly showing that Holt and Mr. Levy were acting on a consultive-agent basis for Trans Ocean and had no role in the activities at issue, Plaintiff filed the instant Complaint against moving Defendants, Holt and his employer, Trans Ocean, and Joseph Levy and his daughter, Maureen Levy (03-CV-3058). Ms. Levy's deposition was never taken. There is nothing in Mr. Levy's testimony providing a basis for filing suit against Holt, Trans Ocean, Joseph Levy, or his daughter Maureen.

Moving defendants were served with the complaint. Joseph and Maureen Levy were not. On July 10, 2003, this case was consolidated with the first action filed by Plaintiff. Discovery in these consolidated cases ended on July 14, 2003.

## II.  RELEVANT UNDISPUTED FACTS

### A.  The Discharge Operations and the Incident of June 23, 2000

Plaintiff alleges that he was a longshoreman employed with Trans Ocean and that on June 23, 2000, while discharging goods from the KENT VOYAGEUR, a vessel owned and operated by Kent Line, he was injured because of the dangerous condition of the cargo. Ex. "A," Complaint, ¶1, 14.

The KENT VOYAGEUR had a cargo of steel plates, steel bars, hollow sections, steel beams, cased machinery, tubes and angles. Ex. "B," Crouse dep., Ex. 4. The vessel arrived in

Gloucester, N.J. on June 22, 2000 and commenced discharging at 6:30 p.m. that evening. Trans Ocean, Plaintiff's employer, was retained by Kent line to act as stevedore and to provide longshore labor to discharge the vessel. Ex. "C," Paul Levy Dep., p. 43.

Plaintiff began working on the vessel on June 23, in No. 3 hold, at approximately 7:00 a.m. Ex. "D," Plaintiff's dep., p. 19. The accident occurred at approximately 8:30 a.m. *Id.*, p. 20. Plaintiff testified that he was injured when the ship listed, causing the cargo to shift[1]:

> Q. Describe for me what you were doing?
>
> A. We were stringing chains under the steel so we could hook it, take chains and hook it to lift it out. And I was bringing a chain up towards a load of I-beams when the ship listed, and the steel under my feet went, and I fell on my shoulders, and went to sit up, and two steel I-beams pinched my right calf muscle, and I was trying to pull my leg out because I was afraid of losing part of my leg there, and another I-beam fell over and landed on my foot.

*Id.*, p. 20. Plaintiff testified that the steel beams were unbundled and "loose." *Id.*; p.22

The persons responsible for the discharge operations were James McLaughlin, the Stevedoring Superintendent, Scott Palmer, the Ship boss, and George Ulmer the Crew Chief, all employed by Trans Ocean. A Cargo Surveyor, Captain William Sammons, was also hired by Trans Ocean to inspect the cargo before discharge.

Plaintiff took the depositions of Messrs. McLaughlin, Ulmer and Sammons.

Mr. McLaughlin, Trans Ocean' Superintendent, testified that it was his duty to inspect the cargo to determine whether it could be safely discharged. Ex. "E," McLaughlin dep, pp. 14-15; 102-104. He inspected the vessel and her cargo and did not note anything unusual. *Id.*, pp. 14-

---

[1] There is no evidence of record why the vessel moved. It should be noted that ships float in water and while at a dock, move when other ships pass and create wakes, and move with the wind and tide. Such movement is a natural and uncontrollable phenomenon and cannot constitute negligence.

15. During his deposition, Mr. McLaughlin reviewed photographs of the cargo in the hold and confirmed that there was nothing that would indicate that the cargo could not be discharged safely. *Id.*, 102-104. Although broken steel cargo bands were observed and can create some difficulties in discharge, this is a frequent occurrence and does not normally prevent a safe cargo discharge. *Id.*

Superintendent McLaughlin testified that when he is conducting his assessment of whether a safe discharge may be made, he relies on the Crew Chief who was is down in the hold itself. *Id.*, 101-102. Trans Ocean's Crew Chief was George Ulmer, who confirmed that it was his responsibility to continually assess the condition of the cargo to determine whether it was safe to discharge. Ulmer dep., Ex. "F," pp. 14-16.

Trans Ocean also retained National Cargo Bureau to provide a surveyor, Captain William Sammons, to inspect the cargo before discharge operations. Captain Sammons, a graduate of the U.S. Merchant Marine Academy and holder of a Master's License issued by the U.S. Coast Guard, is a Senior Surveyor with National Cargo Bureau in the Port of Philadelphia. Ex. "G," Sammons dep., pp. 6, 8, 62. Captain Sammons testified that he climbed into the No. 3 hold and conducted a thorough pre-discharge inspection of the cargo hold on behalf of Trans Ocean. *Id.*, pp. 31-33, 63. He observed that there were bundles of steel with broken bands, and that a number of bundles had "tripped" or shifted. *Id.*, pp. 41-50. However, he, like Superintendent McLaughlin, concluded that there was nothing in the condition of the stow that would have prevented the stevedore from safely discharging the cargo. *Id.,* pp. 63-68. Had he believed any problem in discharging existed, he would have notified Superintendent McLaughlin. *Id.*, pp.74-77.

### B.     The Role of Holt

Holt, which is no longer in business, at times relevant to this litigation was a management consulting agency which performed various consulting services to principals. Ex. "H," Holt Affidavit. These services included contract administration, bookkeeping, billing and invoicing, insurance administration, risk management, and inventory management and control. *Id.* At all times, Holt acted as an agent for its principals, including Trans Ocean Maritime Services, Inc. *Id.*

Joseph Levy, an employee of Holt, was assigned by Holt to Trans Ocean to provide services in the capacity of General Manager, and worked in this capacity from late 1996 until May 1, 2002. Ex. "C," dep. transcript Jos. Levy, pp. 19, 21-22. Although initially brought in to address inventory issues, his duties at Trans Ocean consisted of oversight and management, including contract administration, bookkeeping, billing and invoicing, and inventory management and control. *Id.*, pp. 18-20; Ex. "H." During this period, he occasionally consulted with other principals. Ex. "C," p. 18.

At his deposition, Mr. Levy was questioned by Plaintiff's counsel of his daughter, Maureen Levy, who was also an employee of Holt during relevant times. Ms. Levy was an Environmental Compliance Administrator with Holt and at no time was assigned to provide any sort of services to Trans Ocean, nor was she stationed there. Ex. "H"; Ex. "C," pp. 65-68. Maureen Levy's primary duties with Holt were in the environmental, and not in the occupational safety realm. Ex. "H"; Ex. "C," p. 129-130.

With regard to the incident itself, Mr. Levy testified that he does not recall boarding the vessel, and did not normally go aboard vessels being discharged unless there were extenuating

circumstances such as a productivity problem. Ex. "C," pp.81-82. He did not participate in the discharge activities at issue in this litigation. He did not give any directions concerning the unloading, and did not view the cargo in the hold prior to discharge. Ex. "H." This was not in the realm of his job duties, but the responsibility of the Stevedoring Superintendent, the Ship Boss, and the Crew Chief. Ex. "C," pp. 83-92.

### III.   PLAINTIFF'S CLAIMS

In his Complaint against Trans Ocean, Holt, and Joseph and Maureen Levy, Plaintiff alleges that Holt "assumed responsibility to oversee the safe logistical transport of goods by the longshoremen" at Trans Ocean in that it "supplied safety consultants" to Trans Ocean. Ex. "A," ¶ 5, 12. Specifically, Plaintiff claims that Co-Defendants Joseph Levy and his daughter Maureen Levy were supplied by Holt as safety consultants to Trans Ocean, and that Holt and these individuals breached their duty of insuring safe logistical transfer of the goods during the relevant time. *Id.*, ¶ 13-17; 19-22; 24-27.

Plaintiff also alleges gross negligence against his employer, Trans Ocean, claiming that it was "substantially certain that its delegation of the safe logistical transfer to Defendant Holt and its related failure to hire, supply and train able reasonable provident consultants capable of establishing, assuring, achieving and/or maintaining the safe logistical transfer of goods would cause injury to plaintiff." *Id.*, ¶29. He Further claims that Trans Ocean's actions were "plainly beyond anything the legislature intended the workers' compensation act to immunize" and "constitute wanton and willful misconduct" entitling him to punitive damages. Ex. "A," ¶31-32.

### IV.   LAW

   **A.   Fed. R. Civ. P. 56 Summary Judgment Standard**

The summary judgment standard under Fed. R. Civ. P. 56 is set forth in <u>Celotex v. Catrell</u>, 477 U.S. 317, 91 L.Ed. 2d 265, 106 S.Ct. 2548 (1986). There, the Supreme Court held that once the movant has met its initial burden of showing no genuine issue of material fact, the non-movant must present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324; <u>Jersey Cent. Power & Light Co., v. Lacey Twp.</u> 772 F.2d 1103, 1109 (3d Cir. 1985), cert. den., 475 U.S. 1013, 89 L.Ed. 2d 305, 106 S.Ct. 1190 (1986). The non-movant, rather than rely on mere allegations, must present actual evidence that raises a genuine issue of material fact. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 249, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986). The non-movant must set forth specific facts that show there is a genuine issue for trial. <u>Allstate Financial Corp. v. Financorp. Inc.</u>, 934 F.2d 55 (4th Cir. 1991).

Summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. <u>Celotex</u>, 206 S.Ct. at 2553. A genuine issue for trial must exist; disagreement over immaterial matters will not preclude a grant of summary judgment. <u>Anderson</u>, 477 U.S. at 251-52.

"By its very terms, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.*, pp.247-48. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*, 477 U.S. at 249-50 (citations omitted).

Under this standard, this case is ripe for summary judgment.

**B.     Plaintiff's Claims Must be Dismissed Against His Employer Trans Ocean**

33 U.S.C. §905 (a) of the Longshoreman's and Harbor Worker's Compensation Act ("L.H.W.C.A.") plainly provides that an employer's exclusive liability to an employee for an employment-based injury is the compensation scheme under the Act, and the employer is immunized from all other liability.  Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 938-40, 1990 A.M.C. 2150, 2154-56, (3rd Cir. 1990), reh. den. 910 F.2d 1179 (1990), cert. den., 498 U.S. 1067, 112 L.Ed. 2d 846, 111 S.Ct. 783 (1991); ADM/Growmark River System, Inc., Lim. Pro. BARGE REBECCA, 234 F.3d 881, 2001 A.M.C. 670 (5th Cir. 2000).   There is only one very narrowly tailored exception to this, and that is where the employer acted with the "specific intent to injury the employee."  Johnson v. Odeca Oil and Gas Company 864 F.2nd 40, 1990 A.M.C. 35 (5th Cir. 1989); Sample v. Johnson, 771 F.2d 1335, 1986 A.M.C. 2621 (9th Cir. 1985), cert. den., 475 U.S. 1019, 89 L.Ed.2d 319, 106 S.Ct. 1206, 1986 A.M.C. 2704 (1986); Houston v. Bechtel Associates Professional Corp, D.C., 522 F. Supp. 1094 (D.D.C., 1981); Cobb v. Sipco Servs. & Marine, 1997 A.M.C. 1964 (E.D. La. 1997); Mosley v. Trinity Industries, Inc., et. al., 1998 U.S. Dist LEXIS 2197 (E.D., La. 1998); *accord,* as applied to Pennsylvania Worker's Compensation Act:  Weldon v. Celotex Corp., 695 F.2d 67 (3rd Cir. 1982); Ulicny v. National Dust Collector Corp., 391 F. Supp. 1265 (E.D. Pa. 1975); Tiscornia v. Sysco Corp., 1997 U.S. Dist. LEXIS 9148 (E.D. Pa. 1997).[2]  "The Common Law Liability of the employer cannot be

---

[2] This exception was established in Pennsylvania in Martin v. Lancaster Battery Co., Inc., 530 Pa. 11, 606 A.2d 444 (1992), where the Pennsylvania Supreme Court held that the "intentionally deceitful" act by the employer of altering the employee's blood test results in order to conceal from the employee his lead toxicity went beyond the "bargain struck" under the Workers Compensation Act.  530 Pa. 11, at 17, quoting from Millison v. E.I. dupont de Nemours

stretched to include accidental injuries caused by the gross wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct short of genuine intentional injury." 2A Larson, Workers Compensation Law, § 68.13 at 13-5 and cases cited n.11 (1976), cited in: Houston v. Bechtel Associates Professional Corp., D.C., *supra*, 522 F.Supp. at 1095-96; Weldon v. Celotex Corp., *supra*, 695 F.2d at 72-73; Ulicny v. National Dust Collector Corp., *supra,* 391 F. Sup. 1265, at 1268 (E.D. Pa. 1975); Mosely v. Trinity Industries, Inc., *supra.* Absent such specific intent, the employee is foreclosed from maintaining a tort action against his employer. *Id*; see also: Austin v. Johns-Mansville Sales Co., 508 F. Supp. 313 (D.C. Me. 1981), and cases cited therein.

Plaintiff has made no claim that Trans Ocean committed any acts against Plaintiff with the specific intent to injure him, nor are there any facts to support such an assertion. As such, this matter must be dismissed as a matter of law since it is undisputed fact that Trans Ocean did not commit any acts against the plaintiff with the specific intent to injury him.[3]

### B. Plaintiff's Claims Against Holt Must Be Dismissed Since it Committed No Negligent Acts

Holt provided limited consultation services to its disclosed principal, Trans Ocean, consisting of assigning Joseph Levy to perform General Manager duties. As set forth in the Fact section of this Memorandum, Mr. Levy's duties consisted of oversight and management, including contract administration, bookkeeping, billing and invoicing, and inventory management and control. He did not board the M/V KENT VOYAGEUR or participate in the unloading activities

---

& Co., 101 N.J. 161, 501 A.2d 505, 515 (1985).

[3] Additionally, this claim must be dismissed on the pleadings under Fed. R. Civ. P. 12(c), since Plaintiff has failed to plead a claim cognizable under the law.

at issue in this litigation. He did not give directions concerning the unloading, nor view the cargo in the hold prior to discharge. These responsibilities rested with the Stevedoring Superintendent, the Ship Boss, and the Crew Chief, as testified to by Messrs. McLaughlin, Sammons, Ulmer, and Levy.

The only other Holt employee who was assigned to Trans Ocean during the relevant time period was Madeleine Herbert, whose duties were limited to billing activities. Ms. Herbert had no involvement in the discharge operations of the vessel on June 6, 2002, at Port of Philadelphia's Gloucester City, New Jersey Terminal. Ex. "H"; Ex. "C," pp. 34-35.

An agent such as Holt which acts for a disclosed principal such as Trans Ocean, in the absence of circumstances showing independent fault, cannot be held liable for the negligent acts of its principal. Valenti v. Home Lines Cruises, Inc., 614 F. Supp. 1 (D. N.J. 1984); Seigler v. American Surety Co., 151 F. Supp. 556 (D.Ca. 1957); Rookard v. Melko, 680 F.2d 1257, 1261 (9th Cir. 1982); Fuller v. Melko, 76 A. 2d 683 (N.J. 1950); 3 C.J.S. 119, §215; Dodson Co. v. Delano, 266 Pa. 560, 109 A. 676 (Pa. 1920).

Assuming, *arguendo*, that there was any fault on the part of Co-Defendants Trans Ocean, Kent Line, or Inchcape, there are no facts in the record which show *independent* fault on the part of Holt and/or its employees. The deposition testimony elicited in this litigation and the Affidavit of Holt clearly establish that no one from Holt, including Mr. Levy and his daughter, were responsible for activities involved in the discharge process at issue. His daughter was never even assigned to Trans Ocean and her duties as Environmental Compliance Administrator for Holt have no bearing on this litigation.

The testimony shows that those in charge of coordinating, directing, and making all

decisions with regard to discharge operations were Trans Ocean's Stevedoring Superintendent, James McLaughlin, and those working under his direction, including the Ship Boss, Scott Palmer; the Crew Chief, George Ulmer; and Captain Sammons of the National Cargo Bureau, who Trans Ocean retained to conduct a pre-discharge survey of the cargo holds. Testimony is that thorough inspections were made and these individuals concluded that the holds were safe for discharge.

Plaintiff's allegation of negligence boils down to the assertion that the ship listed causing the cargo to shift. The wake from a passing vessel may cause a ship to list. A sudden change in a vessel's internal equilibrium may cause a ship to list. A rogue wave or other abrupt change in sea conditions may cause a ship to list. But it cannot be reasonably claimed, nor is there any evidence on the record to suggest that the stevedoring supervisors, let alone Mr. Levy or Holt, caused the vessel to list. At this post-discovery stage, it is clear that there is no factual basis to Plaintiff's claims.

Summary judgment is proper where, as in this case, the Plaintiff fails to present evidence demonstrating the existence of negligence against the movant. <u>Cannida v. Central Gulf Steamship Corp.</u>, 452 F.2d 949 (3rd Cir. 1971); <u>Zimmer Paper Products, Inc. V. Berger & Montague, P.C., et. al.</u>, 586 F.Supp. 1555 (E.D. Pa. 1984); <u>Santarelli v. BP America, et. al.</u>, 913 F.Supp. 324 (M.D. Pa., 1996); <u>Wolf v. Methodist Hospital</u>, 1987 U.S. Dist. LEXIS 9313 (E.D. Pa. 1987); <u>D'Alessandro v. Ludwig Honold Mfg. Co., et. al.</u>, 1997 U.S. Dist. LEXIS 18691 (E.D. Pa. 1997), recon. den., 1997 U.S. Dist. LEXIS 20789 (1997). Likewise, summary judgment is proper if the record cannot reasonably support a finding of proximate cause. <u>Tallman v. Barnegat et. al.</u>, 43 Fed. Appx. 490, 2002 U.S. App. LEXIS 19051 (3rd Cir. 2002); <u>Best v. Essex County</u>, 986 F.2d 54 (3rd Cir. 1993); <u>Commonwealth Bank & Trust Co. v. Russell</u>, 825 F.2d. 12

(3rd Cir. 1984), cert. den., 471 U.S. 1131 (1985); City of Philadelphia v. Beretta USA Corp. et al., 277 F.3d 415 (3rd Cir. 2002); Sound Ship Building Corp. v. Bethlehem Steel Co., 533 F.2d 96 (3rd Cir. 1996), cert. den., 429 U.S. 860, 50 L.Ed.2d 137, 97 S.Ct. 161 (1976). A motion for summary judgment must set forth specific facts showing a genuine issue for trial and may not rest upon a mere allegation or denial of its pleadings. Sound Ship Building Corp., *supra*.; Quiroga v. Hasbro, Inc., 934 F.2d 497 (3rd Cir. 1991).

There is nothing in the record to indicate that Holt or its employees breached any duty of care owing to the Plaintiff. More specifically, there is no evidence to show that any actions or inactions on the part of Holt proximately caused Plaintiff's injuries. Holt was not responsible for the ship while it was at the dock being discharged by Trans Ocean. And it was particularly not responsible for any movement of the ship that caused the cargo to shift, as alleged by the Plaintiff.

### C. Plaintiff's Claims Against Holt Must be Dismissed Since Joseph Levy Was the Borrowed Servant of Trans Ocean

The only person having any role with Trans Ocean in this litigations is Joseph Levy. As set forth above, the facts are undisputed that his role with Trans Ocean was limited to general managerial duties and that he did not participate, supervisorily or otherwise, in the cargo discharge operations at issue. Even assuming, *arguendo*, that he did, under applicable case law, Mr. Levy was a borrowed servant of Trans Ocean and thus shares the latter's immunity to suit provided by §905 (a) of the LHWCA. Peter v. Hess Oil Virgin Island Corp., 903 F.2d 935, 1990 A.M.C. 2150 (3rd Cir. 1990), reh. en banc den., 910 F.2d 1179 (1990), cert. den., 498 U.S. 1067, 112 L.Ed. 2d 846, 111 S.Ct. 783 (1991); Louise v. Shell Oil C.L.P,,. 413 F.2d 301 (3rd Cert 1969); Huff v. Marine Tank Testing Corp. 631 F.2d 1140 (4th Cir. 1980); Vanterpool v. Hess Oil

V.I. Corp., 766 F.2d 117 (3rd Cir. 1985), cert. den., 474 U.S. 1059, 88 L.Ed.2d 777, 106 S.Ct. 801 (1986); Revak v. Network Shipping, et. al., 1996 U.S. Dist. LEXIS 15524 (E.D. Pa. 1996).

The issue of whether a borrowed servant situation exists, although requiring factual scrutiny, is generally a matter of law. Gaudet v. Exxon Corp., 562 F.2d 351, 357-58, 1978 A.M.C. 591, 597-98 (5th Cir. 1977), cert. den., 436 U.S. 913, 56 L.Ed.2d 414, 98 S.Ct. 2253 (1978). Because the issue is essentially one of determining the extent of coverage under the L.H.W.C.A., federal law applies. *Id*., 1978 A.M.C. at 597, 562 at 357. The focus of inquiry is determining first, whether the borrowing employer was responsible for the borrowed employee's working conditions; and second, whether the employment was of such duration that the borrowed employee could be assumed to have acquiesced in the risks of the new employment. Peter v. Hess Oil, *supra*, 903 F.2d at 935, citing Gaudet and Vanterpool. Nine factors are used in this analysis: (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details for cooperation? (2) Whose work is being performed? (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer? (4) Did the employee acquiesce in the new work situation? (5) Did the original employer terminate his relationship with the employee?[4] (6) Who furnished tools and place for performance? (7) Was the new employment over a considerable length of time? (8) Who had the right to discharge the employee?[5] (9) Who had the obligation to pay the employee? Gaudet, 562 F.2d at 355; Peter v.

---

[4] This factor does not require a lending employer to completely sever its relationship with the employee, since this would effectively terminate a lender-borrower relationship. Capps v. N.L. Baroid-NL Indus., Inc. 784 F.2d 615, 617 (5th Cir 1986), cert. den., 479 U.S. 838 (1986).

[5] This factor addresses the issue of whether the borrowing employer had the right to terminate the borrowed employee. Capps, *supra* fn. 2, 784 F.2d at 618. In this case, Trans Ocean clearly did.

Hess Oil, 2157-2158.

The undisputed facts in this case overwhelmingly point to the conclusion that Trans Ocean was responsible for Mr. Levy's working conditions, that the employment was over a considerable length of time (five and one half years), and that Mr. Levy was thus the borrowed servant of Trans Ocean. Of the nine factors which the Courts look to, only one factor, number 9, would at first glance appear to militate against a borrowed servant finding since Holt paid Mr. Levy's salary during the time he was assigned to Trans Ocean. However, in fact, this factor supports a borrowed servant finding, since Holt billed Trans Ocean for consulting work provided, including Mr. Levy's services. Ex. "H".

### D.   Rule 11 Sanctions Should be Awarded

Fed. R. Civ. P. 11 imposes on the party who signs a court document an affirmative, non-delegable duty to conduct an independent inquiry and analysis of the facts and law before filing. Pavelic & LeFlore Marvel Entertainment Group, 493 U.S. 120, 125-27, 110 S.Ct. 456, 459-60, 107 L.Ed. 2d 438 (1989); Business Guides, Inc. v. Chromatic Communications Enters., 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed.2d 1140 (1991). The signature constitutes a certification that the signer has conducted a reasonable inquiry and determined that the pleading was factually well-grounded. Lony v. E.I dupont de Nemours & Co., 935 F.2d 604, 616 (3rd Cir. 1991).

The Third Circuit has consistently held that the Rule 11 test is "now an objective one of reasonableness" which seeks to discourage pleadings "without factual foundation, even though the paper was not filed in subjective bad faith." *Id.*, 935 F.2d 604, 616 (3rd Cir. 1991); Lieb v. Topstone Indus., 788 F.2d. 151, 157 (3rd Cir. 1986); Bradgate Assoc., Inc . v. Fellows, Read & Assoc., Inc., 999 F.2d 745 (3rd Cir. 1993).

The record in this case strongly suggests that Plaintiff has violated Rule 11. First, there are no facts on the record to support the allegations against Trans Ocean and Holt and its employees, Joseph Levy and his daughter. The sole factual basis of Plaintiff's second Complaint is the deposition transcript of Mr. Levy. Nowhere in that transcript is there a reasonable basis for finding Holt independently liable. Naming Mr. Levy's daughter, Maureen, as a party purportedly linking Holt to negligence, is especially indicative of the frivolous, and indeed *mala fides*, manner in which this Complaint was filed. Mr. Levy clearly testified that his daughter was never assigned to Trans Ocean. Mr. Levy clearly testified that his daughter was an Environmental Compliance Coordinator with Holt who had nothing to do with the discharge operations at issue. Plaintiff did not even make an effort to depose her or obtain discovery regarding either her or Mr. Levy's role at Trans Ocean.

Second, Plaintiff obviously conducted little or no review of the applicable law regarding employer immunity under the L.H.W.C.A. prior to filing his claims against his employer, Trans Ocean. Had he conducted even a cursory review, it would have been quite clear that asserting "gross negligence" or "punitive damages" (albeit with no factual foundation) does not provide a basis for side-stepping the employer immunity provided in the L.H.W.C.A..

It is respectfully submitted that Plaintiff's actions in this case provide a strong foundation and, indeed, a retributive impetus, for imposing sanctions.

V.   **CONCLUSION**

For the reasons set forth above, SLS Inc. d/b/a/ Holt Oversight and Logistical Technologies and Trans Ocean Maritime Services, Inc. pray this honorable Court grant their

motion for summary judgment, together with an award of costs, attorney fees, and such other sanctions as this Court deems appropriate under Fed. R. Civ. P. 11.

                              Respectfully submitted,

                              MATTIONI, LTD.

Dated: August 19, 2002                BY: _____
                                                      FAUSTINO MATTIONI, ESQUIRE
                                                        PAUL A. KETTUNEN, ESQUIRE
                                                        399 Market Street, Second Floor
                                                       Philadelphia, PA 19106
                                                        (215)629-1600